IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


RICHARD C. ANGINO, ALICE K. ANGINO, :
KING DRIVE CORP. :
                 Plaintiffs :
    v. :     1:CV-05-1748
                                 :     (JUDGE VANASKIE)
J. THOMAS VAN WAGNER, Individually :
and as a Supervisor of Middle Paxton :
Township, et al. :
                 Defendants :


MEMORANDUM

      Plaintiffs, Richard C. Angino, Alice K. Angino, and King Drive Corp., brought this civil

rights action pursuant to 42 U.S.C. § 1983 to seek redress for Defendants' alleged wrongful

interference with their efforts to develop their property located in Middle Paxton Township,

Pennsylvania.  Plaintiffs claim that Defendants acted in derogation of substantive due

process and equal protection safeguards in a number of respects.  The gist of their claims is

that Defendants have engaged in a concerted and protracted campaign to thwart Plaintiffs'

plans to develop their property as a multi-use resort.  Defendants include Middle Paxton

Township and Township Supervisors Thomas J. VanWagner, Jeffery Smith, Richard Peffer,

Mary Jane Davis, and Serell Ulrich.  Presently pending is Defendants' Motion for Summary

Judgment.  (Dkt. 62.)[1]  Because Plaintiffs' challenge to the restrictive definition of the term

---

      [1]  For the convenience of the reader of this Memorandum opinion in electronic
format, hyperlinks to the Court's record and to authority cited herein have been inserted.
The Court accepts no responsibility for, and does not endorse, any product, organization, or

"resort" in the Middle Paxton Township Zoning Ordinance is barred by a final state court adjudication, and because Plaintiffs have failed to supply sufficient evidence to create a genuine dispute of fact material to any of their other claims, and Defendants are entitled to judgment as a matter of law, Defendants' Motion for Summary Judgment will be granted.

I.    BACKGROUND

      A.  Factual Background

      Plaintiffs own approximately 810 acres of predominantly wooded valley and mountainside land in Middle Paxton Township, Pennsylvania ("the Property").[2]  (Smith Report, Dkt. 63-5, at 13.)[3]  The Property includes 52 acres reserved for the owners' private residence and grounds.  The remaining 758 acres contain commercial, residential, and recreational facilities, as well as vast acreage of undeveloped land.  (Cieri Report, Dkt. 63-5, at 3.)  The Property is generally known, operated, and marketed as Felicita Resort.

      Plaintiffs purchased the first parcel of land in what was to become Felicita Resort by

---

content at any hyperlinked site, or at any site to which that site might be linked.  The Court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

    [2] Plaintiffs Richard and Alice Angino own the Property either directly or through King Drive Corp., of which they are the sole stockholders and sole officers.  (Angino Dep., Dkt. 63-4, at 2.)  Richard Angino, who is a licensed attorney, represents himself as well as his wife and King Drive Corp. in this litigation.

    [3]  Citations to page numbers refer to the page number of the document on the CM/ECF electronic record.

acquiring 52 acres of land and a residence in 1971. (Id. at 2.) Plaintiffs acquired additional

land in Middle Paxton Township over the next four decades, with the largest acquisitions of

a former nudist colony and separate golf course occurring during the mid-1990s. (Schedule

of Development Acquisitions, Dkt. 66, at 24.) The Plaintiffs improved the property by

renovating and upgrading the original golf course facilities, installing extensive gardens, and

constructing a spa and fitness center. (Smith Report, Dkt. 63-5, at 2.) In connection with

these improvements, Plaintiffs were required to construct upgraded and/or expanded

parking facilities, community water and sewer systems, storm water management facilities,

and internal road systems. (Id.)

> One of Plaintiffs' experts describes Felicita Resort as:
>
> a 'mixed use resort' that includes commercial, residential and recreational
> facilities which are commonly found in today's resorts. Felicita's commercial
> facilities include two restaurants, two banquet halls, a grillroom, lounge/bar
> and a small hotel. Residential uses include single-family detached dwellings
> on lots ranging in size from 1/3 acre to 52 acres, 40 rental lodges, a furnished
> rental house on Lakewood Drive, a 2-story apartment across from the spa
> and a three-bedroom golf house above the administration building. Various
> recreational facilities are provided by the 18-hole championship golf course
> with practice area and clubhouse, tennis courts, swimming pool, fitness
> center, soccer field, volleyball and bocce ball courts. Other amenities
> supporting the resort include a health spa, landscaped gardens with
> fountains, nature/hiking trails, a plant nursery, administration offices and
> maintenance facilities.

(Ciere Report, Dkt. 63-5, at 3.)

> Plaintiffs seek to more fully develop their landholdings as a multi-use resort, but have

been frustrated by Defendants and a zoning regime that another of Plaintiffs' experts opines is inconsistent with both the historic and planned use of Plaintiffs' property. (Smith Report, Dkt. 63-5, at 16.) Their frustration erupted in a spate of litigation spanning a period of more than ten years.

Many of the legal proceedings concerned the Township's Zoning Ordinances. Middle Paxton Township adopted an initial Comprehensive Plan in 1979, a Comprehensive Plan Update in 1987, and a Comprehensive Plan Update and Recreation Plan in 1998. (Smith Report, Dkt. 63-5, at 14; 1998 Update, Dkt. 23-20, at 1.) Additionally, the Middle Paxton Township Zoning Ordinances were updated and changed numerous times over the course of Plaintiffs' acquisition of property.

The 1979 Zoning Ordinance zoned the land then held by Plaintiffs as Residential Agricultural (RA), with a 22,500 square foot lot required for a single family residence. (Smith Report, Dkt. 63-5, at 14.) The Zoning Ordinance adopted in 1988 generally required a one acre lot size, with a two acre lot size needed for property containing slopes greater than fifteen percent. (Id.) As noted above, the bulk of Plaintiffs' landholdings was acquired during the 1990s, with more than 550 acres being purchased during that decade. The Middle Paxton Township 2000 Zoning Ordinance (the "2000 Ordinance") placed all of

Plaintiffs' property in an Agricultural/ Rural Residential district.[4]  As explained in the 2000

Zoning Ordinance:

> The purpose of the A-RR - Agricultural and Rural Residential District is to permit, protect, and encourage the continued use of the land therein for agricultural or silviculture uses while also permitting residential development. Districts designated A-RR . . . are to be used for farming, residential and accessory uses until a logical demand occurs for urban-type development in general conformance to the current Comprehensive Plan.  This district may accommodate schools, churches, parks and residential uses under certain conditions.  This district is established in areas where agriculture is the most prominent use, in areas where no utilities exist, accessibility is difficult, in areas of unique natural beauty or in areas which are presently undeveloped, to conserve the existing character of such areas and to provide for rural residential and agricultural uses. The preservation of open spaces and environmentally sensitive areas should be encouraged.

(2000 Ordinance, Dkt. 66, at 21.)  The 2000 Ordinance sets out the density requirements for

conventional residential development in the A-RR District.  (Id. at 23.)  As explained by Ms.

Smith:

> The A-RR District imposes a minimum 2 acre minimum lot size (50 acres for resorts), but further imposes increasingly restrictive density requirements based on increasing parcel size.  Under the density requirements, a property greater than 15 acres in size may be developed for 5 dwelling units plus one additional unit for every additional 3 acres of land.

(Smith Report, Dkt. 63-5, at 14.)

----

[4]  The Property was initially zoned within the A-RR zone, until Mr. Angino convinced the Board to change the zone to R-1, which would have allowed one-acre zoning with cluster development.  After the Board decided that resorts would be an approved use in A-RR, the Property was again placed in the A-RR zone.  (Angino Dep., Dkt. 63-4, at 26.)

The A-RR district also limited development based on a "steep slope" provision that limited the number of structures that could be built on certain acreage based on the grade of the property. Property with a twelve percent slope required three acres to build, property with a fifteen percent slope required five acres to build, and property with an eighteen percent or greater slope required ten acres to develop. (Amended Complaint, Dkt. 22, at ¶ 78; 2000 Ordinance, Dkt. 66, at 23.)

The 2000 Ordinance purports to permit "resorts" as an approved use in the A-RR district. (2000 Ordinance, Dkt. 66, at 22.) The term resorts, however, is defined narrowly as:

> A hotel or motel that serves as a destination point for visitors. A resort generally provides recreational facilities for persons on vacation. A resort shall be self-contained and provide personal services customarily furnished at hotels including the service of meals. Buildings and structures in a resort shall contain the scenic quality of the location in which the resort is situated.

(2000 Ordinance Definitions, Dkt. 66-3, at 76.) A hotel is defined in the 2000 Ordinance as:

> A building designed for occupancy primarily as the temporary abiding place of individuals who are lodging with or without meals, in which buildings:
> a. There are more than ten (10) sleeping rooms;
> b. Fifty percent (50%) or more of the gross floor area shall be devoted to residential use;
> c. There may be club rooms, ball rooms, common dining facilities and swimming pools;
> d. Such hotel services as maid, telephone and postal services are provided.
> e. Business may be conducted when accessory and incidental.

(Id. at 77.) Motel is defined as "[a] group of attached or detached buildings containing

6

sleeping rooms or living units with accessory facilities designed for temporary uses by automobile tourists or transients including auto courts, motor lodges and similar establishments."  (Id. at 78.)

Plaintiffs argue that the definition of "resort" is part of a concerted effort to prevent their development of a multi-use resort, similar to places like Kiawah Island.  In this regard, Plaintiffs allege:

> Defendants and previous Middle Paxton Township's Boards of Supervisors individually and collectively have conspired with their solicitors, engineers, other public officers, including Dauphin County Conservation and the Department of Environmental Protection and Dukes Pepper, assistant counsel, for DEP, Southcentral Regional Offices, to preclude virtually all development and particularly Plaintiffs' plans to develop a resort facility with multi-family condo type residences and/or condo hotel facilities.

(Amended Complaint, Dkt. 22, at 8.) Plaintiffs argue that, in addition to the definition of "resort," various provisions of the Zoning Ordinance are arbitrary and unreasonably preclude development of a multi-use resort, such as the steep slope provisions and cul-de-sac length restrictions.  Additionally, Plaintiffs contend that executive action taken by the Defendants, including reporting alleged environmental law violations to the Department of Environmental Protection ("DEP"), requiring a public road for a ten lot subdivision, requiring an impenetrable core in a detention basin, unreasonably delaying the approval of a conference center, improperly requiring a site plan for erection of a "pole barn," and prohibiting Plaintiffs from placing certain signs for the Felicita Resort, violated their

7

substantive due process and equal protection rights.

B. Procedural Background

In August 1997, Plaintiffs commenced a mandamus action against the Board of Supervisors of Middle Paxton Township in the Court of Common Pleas of Dauphin County, concerning, among other property issues, "the plaintiffs' proposed development of fifty lodges on their Felicita spa and fitness center resort." (Mar. 2000 Memorandum Opinion, Dkt. 23-11, at 3.) Plaintiffs also brought an action in this Court, docketed to No. 1:CV-97-1265, raising essentially the same issues. The parties entered into mediation in the state court proceedings, resulting in a March 16, 1998 stipulation and agreement settling all issues and withdrawing and discontinuing the state court mandamus action and the federal court litigation. (Amended Complaint, Dkt. 22, at ¶ 19.)

In January 2000, Plaintiffs filed a civil rights action in the Middle District of Pennsylvania. The action alleged that the Defendants were wrongfully preventing them from developing their land in Middle Paxton Township. On April 4, 2002, the Honorable A. Richard Caputo granted Defendants' motions for summary judgment and dismissed the action without prejudice, determining that Plaintiffs' claims were not ripe because they had failed to pursue available processes to determine how the Middle Paxton Township zoning provisions would be applied in the context of Plaintiffs' planned development, such as an application for a curative amendment or a substantive challenge to the validity of the

ordinance before the Township's Zoning Hearing Board. (Apr. 4, 2002 Order, Dkt. 23-6.)

On April 15, 2002, Plaintiffs filed with the Board of Supervisors of Middle Paxton Township (the Board) an Amended Challenge to the Validity of the 2000 Zoning Ordinance Coupled with a Curative Amendment (the "Challenge"). (Dkt. 23-7.) The Challenge alleged that "various sections of the 2000 Zoning Ordinance are unconstitutional, illegal, contrary to established precedent, contrary to Middle Paxton Township's 1987 and 1998 Comprehensive Plans and/or violative of the Anginos' and King Drive's right to use, develop, and/or sell some or all of their land." (Id. at 1.) Over a three year period the Board held 27 days of hearings.[5] (July 30, 2006 Memorandum Opinion & Order, Dkt. 63-2, at 68.) On August 9, 2005, the Board rendered a 62-page written opinion consisting of 316 findings of fact and 119 conclusions of law. (Id.) The Board denied all aspects of the Challenge, with the exception that the steep slope provision of the Township's 2000 Zoning Ordinance (Section 1104.B) was found to be invalid.[6] (Id.) With respect to the matters at issue in the matter sub judice, the Board concluded:

 7. The Township is not required to provide for a "regional multi-use resort community".
 8. The Zoning Ordinance is not irrational, arbitrary or capricious or otherwise

---

[5] On October 25, 2002, Plaintiffs filed another civil rights action in this Court, docketed to No.3:02-CV-1922. Judge Caputo dismissed this action on ripeness grounds in a Memorandum and Order filed on Feb. 5, 2003. (Dkt. 21.)

[6] The steep slope provision has since been changed. (Cieri Report, Dkt. 63-5, at 7.) Plaintiffs do not contend that the current steep slope provision is unconstitutional.

9

invalid for failing to include more specific regulations governing "resorts".

9.  The two-acre minimum lot area for dwellings in the Agricultural and Rural Residential District (A-RR) is valid.

10.  The boundaries of the Agricultural and Rural Residential District (A-RR) are not arbitrary or capricious, and the Zoning Map and its designation of the boundaries of the Agricultural and Rural Residential District (A-RR) are valid.

11. The Agricultural and Rural Residential District (A-RR) allows many uses other than farming

12. Section 1104.B of the Zoning Ordinance does not meet the requirements of Pennsylvania law.

. . . .

(Bd. of Supervisors Decision, Dkt. 63-2, at 64.)

On August 22, 2005, Plaintiffs appealed this decision to the Court of Common Pleas of Dauphin County.  (Id.)  The Dauphin County Court issued an opinion on July 30, 2006, finding that Plaintiffs:

> have failed to show that the August 9, 2005, Decision of the Middle Paxton Township Board of Supervisors is not sufficiently supported by the record and it did not abuse its discretion or commit an error of law. . . . . Appellants did not present sufficient evidence throughout the 27 hearings (although they clearly and repeatedly expressed their disagreement with the Board's evidence) to rebut the presumption that the Ordinance is valid or to demonstrate that the Board acted without substantial evidence in denying the Appellants' Challenge.

(Id. at 76.)

Plaintiffs appealed the Dauphin County Court decision to the Commonwealth Court of Pennsylvania, which affirmed the trial court's decision on March 20, 2007.

(Commonwealth Opinion, Dkt. 63-3, at 2.)  Plaintiffs filed a Petition for Allowance of Appeal, which was denied by the Supreme Court of Pennsylvania on October 11, 2007.  An

Application for Reconsideration was denied by the Pennsylvania Supreme Court on December 6, 2007. (Dec. 6, 2007 Order, Dkt. 63-3, at 14.) Plaintiffs then filed a petition for a writ of certiorari with the Supreme Court of the United States, which was denied on June 9, 2008. (Dkt. 63-3, at 17.)

On August 29, 2005, shortly after appealing the Board of Supervisors' adverse decision to the Dauphin County Court, Plaintiffs filed the current action. (Dkt. 1.) On July 21, 2006, Plaintiffs filed an Amended Complaint. (Dkt. 22.) Defendants filed a Motion to Dismiss on August 2, 2006. (Dkt. 24.) On November 3, 2006, this Court held oral argument on the Motion to Dismiss, which the Court granted in part and denied in part. (Dkt. 42.) On November 17, 2006, this Court stayed the current action pending the issuance of a ruling by the Commonwealth Court of Pennsylvania in the direct appeal from the Board of Supervisors' decision. (Dkt. 52.) On December 17, 2007, this court vacated the stay of litigation and re-opened the current action. (Dkt. 58.) On July 18, 2008, Defendants filed the pending Motion for Summary Judgment. The Motion has been fully briefed and is ripe for review.

II.    DISCUSSION

A. Effect of this Court's Denial of the Motion to Dismiss

The parties do not dispute that Plaintiffs' claims trigger the two standards of review in substantive due process cases involving land use restrictions: first, Plaintiffs' challenge to

the validity of certain aspects of the Zoning Ordinance invokes the arbitrary and irrational standard of review. See County Concrete Corp. v. Town of Roxbury, 442 F.3d 159, 169-70 (3d Cir. 2006). And second, Plaintiffs' contentions with respect to the application and enforcement of land use restrictions call for review under the "shocks the conscience" standard. See United Artist Theatre, Inc. v. Twp. of Warrington, 316 F.3d 392, 400 (3d Cir. 2003).

Defendants argue that the testimony of Mr. Angino and Plaintiffs' expert witnesses, along with the Plaintiffs' expert reports, when considered in the context of the Zoning Hearing Board adjudication and ensuing state court proceedings, are insufficient to support any of Plaintiffs' claims. In response, Plaintiffs argue that this Court's denial of Defendants' Motion to Dismiss compels denial of their summary judgment motion. (Brief in Opp., Dkt. 65, at 10.) Essentially, Plaintiffs appear to be asserting that because this Court found that they had pleaded viable causes of action, summary adjudication of their claims is necessarily foreclosed.[7]

---

[7] Plaintiffs' brief in opposition to the summary judgment motion occupies but eleven (11) pages and contains no substantial discussion of any case law. Plaintiffs invite the Court to read several hundred pages of exhibits, but make no specific reference to any particular page in the fairly extensive record. Plaintiffs' submissions are disappointingly inadequate, forcing the Court to expend considerable time combing through the record and undertaking research to better comprehend the nature of Plaintiffs' claims and arguments. Plaintiffs have written several letters to the Court, urging a ruling on their motion, but it was Plaintiffs' woefully deficient submissions that delayed ultimate disposition of the summary judgment motion. Plaintiffs seek millions of dollars in this case, and should have prepared

Contrary to Plaintiffs' suggestion, a determination that a complaint satisfies the pleading requirements of Federal Rule of Civil Procedure 12(b)(6) is not an adjudication of the merits of each claim within the complaint. See Harold v. Barnhart, 450 F. Supp. 2d 544, 551 (E.D. Pa. 2006) ("The purpose of a Rule 12(b)(6) motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case."). As explained more than fifty years ago in Cold Metal Process Co. v. United Eng'g & Foundry Co., 190 F.2d 217, 221 (3d Cir. 1951), "allegations are not proof and though a motion to dismiss under Rule 12 may dispose quickly and properly of many such suits, such a motion cannot take the place of proof."

Moreover, the Motion to Dismiss in this case was decided before the United States Supreme Court's decision in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and the Court's more recent decision in Ashcroft v. Iqbal, 129 S. Ct. 1937 (May 18, 2009).[8]  In Twombly the Supreme Court abrogated its longstanding decision in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), which had held that a complaint may be dismissed only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." The Court retired this "no set of facts" language in favor of a new standard: a plaintiff's obligation to state a claim for relief under Rule 8(a)(2) "requires more

their submissions accordingly.

_____

[8] Defendants' Motion to Dismiss was decided on November 3, 2006 (Dkt. 42), and Twombly was decided on May 21, 2007.

than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. As a result of Twombly, plaintiffs were forced to nudge their claims "across the line from conceivable to plausible." Id. Moreover, the Court's more recent decision in Iqbal held that the pleading requirements of Rule 8 mark "a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Iqbal, 129 S. Ct. at 1950. Consequently, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief,'" and the complaint should be dismissed. Id.

This Court's denial of the motion to dismiss the Amended Complaint explicitly relied upon the now-retired "no set of facts" standard of review. (Tr. of Nov. 3, 2006 Oral Arg., Dkt. 51, at 43.)[9] It is not clear that Plaintiffs' Amended Complaint, rife with conclusory

---

[9] The transcript of the Court's statements at oral argument read as follows: "The question before the Court at this time is whether the Plaintiff would be unable to prove any set of facts sufficient to support recovery . . . ." (Oral Argument Transcript, Dkt. 51, at 43.) The Court found that based on "County Concrete and the allegations of the complaint in this case that the Plaintiff has presented a viable substantive due process claim . . . ." (Id. at 43-44.) As the Court stated:

> The question, at this point in time, is not whether the allegations would convince me that there is conscience-shocking conduct here, the question is whether the Plaintiff could prove facts that would convince the fact-finder of conscience-shocking conduct. And, again, at this point in time . . . I cannot

14

assertions, would survive the more searching inquiry demanded by Twombly and Iqbal.

Even the heightened Twombly and Iqbal standards, however, do not require the determination of the merits of the claim at the motion to dismiss stage. Instead, an assessment of the evidence to determine whether there is a genuine issue concerning any material fact is the standard of review at the summary judgment stage. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Thus, Plaintiffs' assertion that "[y]our Court Has Already Determined By Its Order in Response to Defendants' Motion to Dismiss that Plaintiffs' Other Allegations of Civil Rights Violations and the Damages Resulting From Same Are All Jury Issues" is without merit. (See Brief in Opp., Dkt. 65, at 10.) No such determination has been made in this case. Consequently, this Court will review each of Defendants' summary judgment arguments to now decide whether the evidence of record merits a jury trial.

B. Effect of the State Court Adjudication

Defendants argue that certain claims asserted by Plaintiffs were decided in the state court proceedings and cannot be re-litigated here. (Mt. for Sum. Judg., Dkt. 63, at 12.) Title 28, United States Code, section 1738 "requires federal courts to give res judicata effect to a

---

conclude, as a matter of law, that the Plaintiff would be unable to prove such facts.

(Id. at 44.)

state judgment to the extent the state would give its own prior judgment such effect."[10]

Davis v. U.S. Steel Supply, Div. of U.S. Steel Corp., 688 F.2d 166, 170 (3d Cir. 1982).

"This statute has long been understood to encompass the doctrines of res judicata, or 'claim preclusion,' and collateral estoppel, or 'issue preclusion.'"[11] San Remo Hotel, L.P., 545 U.S. at 336.

> In Pennsylvania, the doctrine of issue preclusion applies if: (1) the issue decided in the prior case is identical to the one presented in the subsequent action; (2) there was a final judgment on the merits; (3) the party against whom the doctrine is asserted was a party or in privity with a party in the subsequent case; (4) the party or person in privity with a party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding; and (5) the determination in the prior proceeding was essential to the judgment.

---

[10] 28 U.S.C. § 1738 provides:

Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

[11] "Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit of a different cause of action involving a party to the first case." San Remo Hotel, L.P. v. City & County of San Francisco, Cal., 545 U.S. 323, 336 n.16 (2005). Given the limited scope of the state court litigation – an appeal from the Board of Supervisors' rejection of the Challenge – collateral estoppel, as opposed to res judicata, is the appropriate doctrine in determining here whether the state court's finding that the definition of "resort" is reasonable is binding on this Court.

Lindquist v. Buckingham Twp., 106 F. App'x 768, at *7 (3d Cir. July 19, 2004); see Assocs. in Obstetrics & Gynecology v. Upper Merion Twp, No. 03-2313, 2004 WL 2440779 (E.D. Pa. Oct. 29, 2004).

"Plaintiffs do not dispute the fact that the parties in the constitutional challenge case and the present case are the same or that a final judgment on the merits was reached in the prior suit." (Opp. Brief, Dkt. 65, at 7.) Plaintiffs instead contend that Middle Paxton Township never adjudicated the civil rights issues concerning the definition of "resort" addressed by Plaintiffs in their Amended Complaint, and thus the identity of the issue element is lacking. (Id.)

Specifically, Plaintiffs contend:

> Middle Paxton never in its 13-section "Adjudication" addressed the issue of the validity of the []definition . . . of "resort" in its ordinance. It certainly did not in its adjudication or in its decision address the civil rights issues of Plaintiffs' resort in the context presented in the Amended Complaint.
> Plaintiffs do not dispute the fact that the parties in the constitutional challenge case and the present case are the same or that a final judgment on the merits was reached in the prior suit. Plaintiffs disagree that the instant suit was based on the same cause of action. Plaintiffs in the instant case are not limiting their argument to the definition of "resort" but rather contend that commencing in 1997/1998, Defendants violated Plaintiffs' civil rights by requiring that Plaintiffs in 1997/1998 submit plans for their proposed multi-purpose resort development. Plaintiffs submitted the plans. Defendants' solicitor, an authorized agent of the Township, wrote to Plaintiffs' counsel and stated that the issue of Plaintiffs' "resort" as an approved use would be the subject of proposed amendments to the Township's ordinance. Plaintiffs' resort as an approved use was the specific subject of meetings throughout the Township. Consideration and response by each of the Township Supervisors, the Planning Board, the Township solicitor, etc. All of this was part of the background of the 2000 ordinance that adopted

"resort" as an approved use in A/RR districts. Evidence of meetings, the discussions, the exchange of letters, the comments of the Supervisors, Planning Commission, Township Supervisors, Township Solicitor, etc. appear in Plaintiffs' Appendix at 25, 30, 35, 40.

Plaintiffs were then forced to decide whether to be zoned R-1 with the advantages of one-acre and cluster zoning which would enable Plaintiffs to have 810 units on their 810 acres clustered onto a significantly lesser amount of acreage with much greater density. Under one-acre zoning with cluster, Plaintiffs could have had 810 units on 100 acres with a density of 8-1.

Plaintiffs rightfully expected that the "resort" designation would permit similar intensive development with the types of residences that generally are permitted in multi-purpose resorts, including condos, timeshares, villas, cottages, townhouses, etc.

After Plaintiffs chose R-1[12] "resort", Defendants reneged on their implied promise of a resort as submitted and as exists in the multi-purpose resorts, by limiting residential buildings to "hotel" or "motel" and not permitting villas, cottages, townhouses, or anything other than single-family detached dwellings on two-acre parcels.

Forcing Plaintiffs to choose between R-1 with cluster and A/RR with resort as subsequently interpreted by Defendants clearly constitutes a breach of promise, mutual understanding, Plaintiffs' constitutional right to property and equal treatment under the law, and has resulted in Plaintiffs' being unable to develop their property in a typical resort manner. Resorts in Pennsylvania and throughout the country may or may not have buildings akin to hotels. They certainly do not have buildings that could be defined as "motels" because the definition of motel is not one that anticipates someone coming into a motel as a destination.

Plaintiffs' experts in their reports and in their depositions discussed this subject quite thoroughly. The single issue of the definition of "resort" as addressed in the constitutional challenge is quite different from the civil rights issue presented with respect to Defendants' treatment of Plaintiffs' resort in this civil rights case.

(Opp. Brief, Dkt. 65, at 8-9 (emphasis in original) (footnote added).)

---

[12] It is assumed that Plaintiffs mean A-RR.

The dispositive question here, therefore, is whether there is a substantive difference between the issue presented in the state proceedings and that presented here. That is, did Plaintiffs essentially present the same challenge in the state proceedings that they are asserting here. A determination of this question requires a careful comparison of the allegations presented in this action and the contentions asserted in the state proceedings.

Plaintiffs' Amended Complaint alleges:

> 78. In 2000, the then constituted Board of Supervisors adopted a zoning ordinance that arbitrarily, capriciously, and illegally permitted "resorts" as an approved use in A/RR districts . . . which treated Plaintiffs arbitrarily, capriciously, and illegally and making Plaintiffs' attempt to develop a golf, garden, resort community unfeasible.
> 79. Defendants' "resort" designation, their interpretation, and their actions specifically targeted Plaintiffs because Plaintiffs were the only ones developing a resort residential community . . . . .
> 80. Middle Paxton Township's definition of "resort" does not include <u>or preclude</u> the sale of residential building lots . . . .
>      . . . . .
> 83. Defendants defined "resort" and interpreted their own definition of "resort" in an arbitrary, capricious, and illegal manner so as to preclude Plaintiffs from being able to develop their resort as many resorts are developed with on-site residential housing and/or excluded houses not owned by the Resort and/or permitted 200 room hotels on small parcels but required hundreds of acres for a hundred houses.

(Amended Complaint, Dkt. 22, at ¶¶ 79-83.)

In Plaintiffs' earlier constitutional challenge the Board found that Plaintiffs had requested a determination as to whether the definition of "resort" was arbitrary or capricious.

> Challengers [Plaintiffs] stated three "Constitutional Challenge Issues" in Challengers' Factual and Legal Memorandum (Exhibit C-443) as follows:

. . . .

2.    Is the Township's definition of "resort" ambiguous, arbitrary and capricious, unduly restrictive, etc. in permitting overnight housing, including lodges, hotels, and motels, without any limiting density and/or slope considerations and perhaps permitting residential units owned by the resort and leased to residents on a year-round basis and/or perhaps permitting some form of condominium, townhouse, or timeshare other than outright sale whereas precluding outright sale of lots, houses, townhouses, and condominiums?

(Middle Paxton Township Decision, Dkt. 63-2, at 13.)[13]   The Board cited Best v. Zoning Bd. of Adjustment of the City of Pittsburgh, 393 Pa. 106, 113 (1958), for the proposition that before any ordinance could be declared unconstitutional, it must be determined that the provision is "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare."  (Middle Paxton Twp. Dec., Dkt. 63-2, at 42.) After twenty-seven days of hearings, the Board found:

79.  "Resort" as defined in the Ordinance of Definition and as authorized by the Zoning Ordinance in the Agricultural and Rural Residential District (A-RR) does not include the various types of dwelling units proposed by Challengers.

80.  The Zoning Ordinance is not irrational, arbitrary or capricious for failing to include more specific regulations governing "resorts".

81.  The fact that the Zoning Ordinance does not contain more specific regulations governing development of "resorts" means that a resort, as defined by the Ordinance of Definition, may be developed as

_____

[13]  Although Exhibit C-443 of the record before the Board has not been provided, Plaintiffs fail to allege that the Board was mistaken in its assertion that Plaintiffs presented the "definition of 'resort'" as an issue within the "Constitutional Challenge Issues."

20

long as such resort meets the specific and objective requirements of the
Zoning Ordinance.

(Id., at 57.)

Appealing the Board's decision, Plaintiffs argued that the "Ordinance is exclusionary,
unduly restrictive, discriminatory, arbitrary, and capricious, . . . and contrary to law . . . in
defining and interpreting its definition of "resort" as excluding residential housing not owned
by the resort." (Court of Common Pleas Opinion, Dkt. 63-2, at 68 n.3.) Moreover, the
Plaintiffs focused on the definition of "resort," arguing the "definition and interpretation of
'resort' as applied to Appellants' land is arbitrary and capricious." (Id.) Both the Common
Pleas and Commonwealth Courts rejected Plaintiffs' contention, finding that the Board had
not erred in sustaining the application of the Zoning Ordinance's definition of "resort" to
Plaintiffs' situation.

"Issue preclusion bars relitigation of identical issues adjudicated in a prior action
against the same party or a party in privity." Hitchens v. County of Montgomery, 98 F. App'x
106, 111 (3d Cir. 2004). "Issue preclusion ensures that 'once an issue is actually and
necessarily determined by a court of competent jurisdiction, that determination is conclusive
in subsequent suits based on a different cause of action involving a party to the prior
litigation.'" Id. (quoting Montana v. United States, 440 U.S. 147, 153 (1979)).

"For issue preclusion to apply, the issue decided in the prior adjudication must have
been identical to the one presented in the later action." Id. at 111-12. "'Identity of the issue

21

is established by showing that the same general legal rules govern both cases and that the facts of both cases are indistinguishable as measured by those rules.'" Id. at 112 (quoting Suppan v. Dadonna, 203 F.3d 228, 233 (3d Cir. 2000)).  "'To defeat a finding of identity of the issues for preclusion purposes, the difference in the applicable legal standards must be substantial.'" Raytech Corp. v. White, 54 F.3d 187, 191 (3d Cir. 1995); see also Jim Bean Brands Co. v. Beamish & Crawford Ltd., 937 F.2d 729, 734 (2d Cir. 1991) ("Issues that bear the same label are nonetheless not identical if the standards governing them are significantly different.").  As observed in James Talcott, Inc. v. Allahabad Bank, Ltd., 444 F.2d 451, 459 n.8 (5th Cir. 1971), "[t]here are circumstances when the same historical factual circumstances may be involved in the two actions, but the legal significance of the fact differs in the two actions because different legal standards are simultaneously applicable to it."  The Fifth Circuit went on to note, "[t]his is a very narrow exception to the rule with respect to identity of issues, however, and it's applicable only when there is a demonstrable difference in the legal standards by which the facts are evaluated."  Thus, "the identity element does not require that the issues be exactly identical, and courts instead have held that two issues may be identical for estoppel purposes if they are substantially or essentially the same." Kreinik v. Showbran Photo, Inc., 400 F. Supp. 2d 554, 562 (S.D.N.Y. 2005) (emphasis in original).

To determine whether Plaintiffs' due process rights have been violated, the Court

will need to determine whether the definition of "Resort" is arbitrary or irrational.  See

County Concrete, 442 F.3d at 169.  The definition would be arbitrary or irrational only if "the

governmental body could have no legitimate reason for its decision."  See id. ("'Federal

judicial interference with a state zoning board's quasi-legislation for 'irrationality' or

'arbitrariness' is proper only if the governmental body could have had no legitimate reason

for its decision.'").  In this case, the Board determined that: "[t]he Zoning Ordinance is not

irrational, arbitrary or capricious for failing to include more specific regulations governing

'resorts'."  (Middle Paxton Township Decision, Dkt. 63-2.)   By finding that the Ordinance

was not irrational, and consequently did not violate Plaintiffs' constitutional rights, the Board

conducted the exact same analysis that this Court would undertake.  Consequently, there

would be no difference in the "applicable legal standards" employed.  See Raytech Corp.,

54 F.3d at 191.  Because the "same general legal rules govern both cases" and "the facts of

both cases are indistinguishable as measured by those rules," the claim is barred by

collateral estoppel.  Accordingly, Defendants' Motion for Summary Judgment pertaining to

the definition of "resort" will be granted.

     C. Substantive Due Process and Equal Protection Claims

     Count I of Plaintiffs Amended Complaint seeks relief under 42 U.S.C. § 1983 on the

ground that the conduct of the Defendants deprived Plaintiffs of their federally protected

rights under the Fifth and Fourteenth Amendments of the United States Constitution.

(Amended Complaint, Dkt. 22, at ¶ 99.) "Section 1983 provides remedies for deprivation of rights established by the Constitution, including substantive due process under the Fourteenth Amendment." Chainey v. Street, 523 F.3d 200, 219 (3d Cir. 2008) (citing Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006)). The Fourteenth Amendment provides that the state shall not "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV.

As noted above, "[t]here is a distinction in the standard of review for legislative and executive acts that allegedly violate substantive due process." County Concrete, 442 F.3d at 169.

> While due process protection in the substantive sense limits what the government may do in both its legislative, see, e.g., Griswold v. Connecticut, 381 U.S. 479, 85 S. Ct. 1678, 14 L.Ed.2d 510 (1965), and its executive capacities, see, e.g., Rochin v. California, 342 U.S. 165, 72 S. Ct. 205, 96 L.Ed. 183 (1952), criteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer that is at issue.

County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998).

"'[T]ypically, a legislative act will withstand substantive due process challenge if the government identifies the legitimate state interest that the legislature could rationally conclude was served by the statute.'" County Concrete, 442 F.3d at 169 (quoting Nicholas v. Pennsylvania State Univ., 227 F.3d 133, 139 (3d Cir. 2000)). "'Federal judicial interference with a state zoning board's quasi-legislation for 'irrationality' or 'arbitrariness' is

proper <u>only if the governmental body could have had no legitimate reason for its decision.</u>"

Id. (quoting Phillips v. Borough of Keyport, 107 F.3d 164, 186 (3d Cir. 1997)) (emphasis in original).  Thus, for a substantive due process challenge to an ordinance to be successful, the challenge must "'allege facts that would support a finding of arbitrary or irrational legislative action by the Township.'"  Id. (quoting Pace Resources, Inc. v. Shrewsbury Twp., 808 F.2d 1023, 1034 (3d Cir. 1987)).

The heightened "shocks the conscience" standard applies to executive actions that violate substantive due process.  In cases dealing with abusive executive action, the Supreme Court has "repeatedly emphasized that only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'"  County of Sacramento, 523 U.S. at 846

> The Third Circuit has
>
> recognized that 'every appeal by a disappointed developer from an adverse ruling of the local planning board involves some claim of abuse of legal authority,' but 'land-use decisions are matters of local concern, and such disputes should not be transformed into substantive due process claims based only on allegations that government officials acted with improper motives.'

Dotzel v. Ashbridge, 306 F. App'x 798, 800-01 (3d Cir. 2009) (quoting United Artists Theatre Circuit, 316 F.3d 392, 402 (3d Cir. 2003)).  "To 'shock the conscience,' the alleged misconduct must involve 'more than just disagreement about conventional zoning or planning rules' and rise to the level of self-dealing, an unconstitutional 'taking,' or

interference with otherwise constitutionally protected activity on the property." Id. at 801.

Plaintiffs have asserted violations of their constitutional rights as a result of both legislative and executive action. Defendants properly request this Court to employ the above stated standards in reviewing the legislative and executive actions taken in this case. Plaintiffs misconstrue Defendants' request, arguing that the "shocks the conscience" standard is inappropriate and that this "Court's denial of Defendants' Motion to Dismiss based upon the 'shocks the conscience' test is the law of this case, and Your Court is, therefore, compelled to reject the reargument of this same theme." (Brief in Opp., Dkt. 65, at 7.) This statement, however, is inaccurate. This Court clearly determined during oral argument on the Motion to Dismiss that both standards of review should be applied to respective legislative and executive actions.[14]

"Unlike a substantive due process challenge, where the question is whether it was irrational for a Township to have passed a zoning law at all, in an equal protection challenge the question is whether 'the Township has irrationally distinguished between similarly

---

[14] At Oral Argument the Court identified the two standards of review:

I deny the Motion to Dismiss the substantive due process challenges, which I believe, having read the complaint, fall into two categories; One, legislative, in terms of challenging the 2000 ordinance and the 2005 decision, and the other being challenges to individual actions, over the course of time, that fall into the executive action context.

(Oral Argument Transcript, Dkt. 51, at 44-45.)

situated classes." County Concrete Corp., 442 F.3d at 171 (quoting Rogin v. Bensalem Twp., 616 F.2d 680, 689 (3d Cir. 1980)).  In an equal protection challenge to a zoning ordinance, the first inquiry a court should make "'is to examine whether the complaining party is similarly situated to other uses that are either permitted as of right, or by special permit, in a certain zone.'"  Id. at 171 (quoting Congregation Kol Ami v. Abington Twp., 309 F.3d 120, 137 (3d Cir. 2002)).  If the plaintiff presents evidence of other similarly situated parcels, the defendants must then justify the difference in treatment between the two parcels by demonstrating that the ordinance is rationally related to a legitimate government purpose.  Id.

        To succeed in defeating summary judgment on an equal protection claim, a plaintiff must do more than "simply allege the existence of similarly situated proposals and argue that the Township failed to disprove that it discriminated" against the plaintiff.  Young v. Twp. of Coolbaugh, 276 F. App'x 206, 209 (3d Cir. 2008).  Instead, the plaintiff must "produce evidence of similarly situated proposals that were treated differently from his own land development proposal."  Id.  A "class of one" equal protection argument may "'attack intentionally different treatment if it is irrational and wholly arbitrary,' but this standard is '. . . difficult for a plaintiff to meet in a zoning dispute.'"  Id. (quoting Eichenlaub v. Twp of Indiana, 385 F.3d 274, 279 (3d Cir. 2004)).  To be successful in such a claim, the plaintiff must establish that he or she has been "'intentionally treated differently from others similarly

situated and that there is no rational basis for the difference in treatment.'"  Id. (quoting

Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)).

During the deposition of Mr. Angino, he asserted that the major issues of this case

"will be issues such as what transpired in my attempt to develop a resort."  (Angino Dep.,

Dkt. 63-4, at 7.) In particular, Mr. Angino asserted that although "resorts" were allowed in

the A-RR district within which Plaintiffs' property was located, Defendants intentionally

defined "resort" in a way that would prevent the development of his planned multi-use resort

facility.  (Angino Dep., Dkt. 63-4, at 27.)

As held above, adjudication of this issue is foreclosed under the collateral estoppel

doctrine.  Plaintiffs identify nine other issues, including: 1) the enforcement of an

unconstitutional steep slope law; 2) reports being made to the Department of Environmental

Protection; 3) enforcement of unconstitutional cul-de-sac length requirements; 4)

enforcement of an unconstitutional requirement of a public road for a ten (10) lot

subdivision; 5) the unconstitutional requirement that Plaintiffs create a detention basin with

an impenetrable clay core; 6) the unconstitutional zoning of their property as A-RR; 7) the

unconstitutional discrimination regarding their signage; 8) enforcement of restrictions

regarding the building and use of a pole barn; and 9) the unconstitutional delay in issuing a

conference center permit.[15]  Each of these issues will be reviewed separately.[16]

       1. Steep Slopes

Plaintiffs contend that they were "bound by Defendants' invalid/unconstitutional steep slope law from 1989 to August 10, 2005," and "[b]ecause of Defendants' admittedly invalid/unconstitutional steep slope law, Plaintiffs were unable to develop their property and/or sell building lots particularly during the very advantageous building climate of 2002-2006." (Brief in Opp., Dkt. 65, at 10.)  Defendants argue that "Plaintiffs have not been denied any constitutionally protected right . . . because no plan or permit has been submitted by Plaintiffs that was denied because of the steep slopes provision of the ordinance." (Mt. for Sum. Judg., Dkt. 63, at 18.)  In response to Defendants' contention that Plaintiffs never submitted a plan or asked for a variance, Plaintiffs respond that they "challenged the steep slopes law and were successful," and that "[a] jury should be permitted to determine the extent to which Defendants' invalid/unconstitutional steep slope

---

[15] Mr. Angino clarified his claims in part by responding to a letter from Defense counsel listing Plaintiffs' claims.  Moreover, in his deposition he stated: "Much of my case is due process rather than equal protection . . . . It is the fact that the way in which they have passed laws and interpreted laws and their activities does not have a health, safety, welfare, morality basis." (Angino Dep., Dkt. 63-4, at 16.)

[16] Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment responds to entitlement to relief as a result of the steep slope law, but fails to proffer any argument regarding the remaining eight issues, claiming that this Court has already determined that the remaining claims are jury questions.  As discussed above, this assertion is wrong.

zoning section from 1989-2005 cost Plaintiffs." (Brief in Opp., Dkt. 65, at 10.)

"The remedy for a regulation that goes too far, under the due process theory, is not 'just compensation,' but invalidation of the regulation, and if authorized and appropriate, actual damages." Williamson County Reg'l Planning Com'n v. Hamilton Bank of Johnson, 473 U.S. 172, 197 (1985). When an injury "'remains speculative, tentative, and hypothetical,'" the "'ground for relief falls short of establishing the requisite deprivation of a constitutional right to merit § 1983 relief.'" Holt Cargo Sys., Inc. v. Delaware River Port Auth., 20 F. Supp. 2d 804, 835 (E.D. Pa. 1998) (quoting Reichenberger v. Pritchard, 660 F.2d 280, 285 (7th Cir. 1981)). Under section 1983, "plaintiff bears the burden of proving first that a particular injury it sustained – its loss of future profits – was caused by defendants' allegedly unconstitutional conduct." Am. Marine Rail NJ, LLC v. City of Bayonne, 289 F. Supp. 2d 569, 588 (D.N.J. 2003).

The Board of Supervisors found that "Section 1104.B of the Zoning Ordinance [the steep slope law] does not meet the requirements of Pennsylvania law." (Bd. of Supervisors Decision, Dkt. 63-2, at 64.) Consequently, at a special meeting of the Board of Supervisors on January 17, 2006, the Steep Slope Ordinance was changed. (Dkt. 66, at 42.)

When asked at his deposition whether any of his plans had "ever been turned down because of the steep slope provisions only," Richard Angino responded, "my plans have always incorporated what was their Steep Slope law. So it can't be turned down, because

obviously you would not even have submitted a plan that did not take into consideration the Steep Slope law. So it can't be turned down if it wasn't presented." (Angino Dep., Dkt. 63-4, at 8.)

As Plaintiffs admit that no plan was ever denied because of the steep slopes provision, and no challenge to the validity of the steep slopes provision was made before the curative amendment proceeding, Plaintiffs have failed to offer proof that the steep slope ordinance caused actual damages. See Am. Marine Rail NJ, LLC, 289 F. Supp. 2d at 588. Any damages suffered by Plaintiffs would be purely speculative. See Holt Cargo Sys., Inc., 20 F. Supp. 2d at 835.

Although Plaintiffs never submitted a plan that did not comply, they contend that the important point is that they were "required to submit plans under a Zoning Ordinance that was improper or unconstitutional." (Angino Dep., Dkt. 63-4, at 8.) As Defendants contend, however, "Plaintiffs are no different from any of the other citizens of Middle Paxton Township who may own land that was subject to the steep slope provisions but who never had a plan rejected as a result or who never challenged the ordinance's validity." (Reply Brief, Dkt. 67, at 12.) Without evidence that actual damages have been caused based on denial of a plan that did not comply with the steep slope ordinance, Plaintiffs have failed to prove that the ordinance caused any damage. Consequently, Plaintiffs' due process claim premised on the steep slope ordinance shall be dismissed.

With regard to their equal protection challenge, Plaintiffs have also failed to offer any evidence that similarly situated proposals "were treated differently from [their] own land development proposal." Young, 276 F. App'x at 209. Plaintiffs have offered no proof that the steep slope ordinance was only applied to their property or that other similarly situated properties were treated differently with regard to development on steep slopes. See id. Consequently, Plaintiffs' equal protection claim premised on the steep slope ordinance is without merit and will be dismissed.

2. Reports to the Department of Environmental Protection (DEP)

Plaintiffs' Amended Complaint avers that "Defendants and previous Boards have periodically reported Plaintiffs to Dauphin County Conservation and the Department of Environmental Protection and worked with those governmental units to harass and delay Plaintiffs' development plans." (Amended Complaint, Dkt. 22, at ¶ 39.) With regard to their equal protection claim, Plaintiffs aver, "Defendants, prior boards, individuals from Dauphin County Conservation and the Department of Environmental Protection, have for many years singled out the Anginos for special discriminatory treatment."[17] (Id. at ¶ 36.)

---

[17] More specifically, Plaintiffs aver:

Defendant Davis reported Plaintiffs to the Department of Environmental Protection on more than one occasion and most recently she and Defendant Van Wagner were instrumental in a three-year delay in the DEP's processing of permits because of alleged violations at the 'Boy Scout' camp, holes 1 and 2 at the golf course and private entry to Plaintiffs' house.

During Mr. Angino's deposition, he referred to Defendant Mary Jane Davis as a "busy body," noting that it was "the kind of thing that she was the zoning officer with her nose to the ground." (Angino Dep., Dkt. 63-4, at 11.) Moreover, he claimed that the Defendants are "sticking their nose into DEP regulations, which are not their jurisdiction." (Id. at 14.)

Enforcement of DEP regulations implicates the heightened "shocks the conscience" standard. See County of Sacramento, 523 U.S. at 846. Defendants' actions in relation to environment regulations does not "shock the conscience" as it does not rise to a level of self dealing, corruption, bias against an ethnic group, or any additional activity that may suggest conscience-shocking behavior . See Dotzel, 306 F. App'x at 801; Chainey v. Street, 523 F.3d 200, 220 (3d Cir. 2008).

With regard to the equal protection claim, Plaintiffs argue that the Green Hills Swim Club has caused sediment to go into Fishing Creek. (Angino Dep., Dkt. 63-4, at 12.) Plaintiffs, however, presented no evidence that any Defendant deliberately directed that environmental laws be enforced against Plaintiffs, but not against others. Moreover, when Defense counsel asked:

> Would you agree with me that both Ms. Davis and Ms. Seeds said basically they responded to or respond when they get a complaint; or they personally observe some condition which they think is a violation of the DEP rules and

------------------------------

(Amended Complaint, Dkt. 22, at ¶ 40.)

regulations. And that they are obliged by those regulations, I think they said, to call the Conservation District first and then go to DEP? Would you agree that that was their testimony?

(Id. at 13.) Mr. Angino responded:

Absolutely. And I would not expect anything differently. And I would not even think that either of these, if they had a complaint, would not enforce the law. So I am not suggesting that they don't respond to complaints involving other people. They both, if anything, are conscientious individuals. I can say things about them that sometimes being conscientious may make you a busy body; but I am not asserting that they knew of problems with other people that they did not enforce the law and knew of problems with me and they did enforce the law.

(Id.) Thus, based on Mr. Angino's own testimony, it is clear that Plaintiffs' equal protection claim with regard to DEP reporting is without merit. Other than bald allegations regarding surrounding property, Plaintiffs have failed to offer competent evidence of similarly situated persons that were treated differently.

3. Cul-de-Sac Length

Plaintiffs claim that the Board's maximum cul-de-sac length restriction is unconstitutional. Plaintiffs aver:

In the late 1980s/early 1990s, the then-existing Board of Supervisors fought Plaintiffs' attempts to obtain approval of a small 4 or 5-lot subdivision off of Fishing Creek Valley Road by requiring strict adherence to an extremely short 500 feet[18] cul-de-sac maximum length while permitting a 1250 feet cul-de-sac length for a public road in a much larger adjoining development (Geisel).

_____

[18] The Board's cul-de-sac length ordinance was changed in the 2000 Zoning Ordinance from 500 to 800 feet.

(Amended Complaint, Dkt. 22, at ¶ 42) (footnote added).

In a letter dated May 15, 1991, Solicitor Jeffrey A. Ernico directed a letter to Mr. and Mrs. Angino notifying the couple that at the May 6, 1991 meeting, the couple's subdivision plan was not approved "regarding the length of the cul-de-sac." (May 15, 1991 Letter, Dkt. 66, at 56.) The plan was denied based on violations of Section 501g, "with respect to the curve C-4 which does not meet the minimum radius of the center line for the curve as provided in the Ordinance;" Section 501i, "addressing the length of the cul-de-sac street which is substantially in excess of the requirements of the Ordinance," and section 501k.1, "which addresses the slope of banks along streets." (Id.) Again, in October 1994, after Plaintiffs submitted a sketch plan requesting waivers for cul-de-sac length, road slope, and width, the Board indicated that they were not in favor of granting the waivers as they felt the requests were extreme and not warranted. (Oct. 3, 1994 Minutes, Dkt. 66-2, at 11.)

Plaintiffs argue that there is no "safety, welfare basis for any cul-de-sac. If you look at PennDOT and ASHTO, they have no limitation on length of cul-de-sacs." (Angino Dep., Dkt. 63-4, at 15.) When asked about his familiarity with other zoning and subdivision land development ordinances, however, Plaintiffs' expert, James Cieri, stated that an 800 foot cul-de-sac restriction was "within the normal range; because the normal range we see goes from 500 feet to 1,500 feet. That is the normal range. So 800 is kind of in the middle." (Cieri Dep., Dkt. 63-6, at 15.)

As the cul-de-sac length restriction involves a legislative act, an arbitrary and irrational standard of review is employed. As Plaintiffs' expert has specifically stated that the cul-de-sac length requirement is within the normal range, it cannot be argued that there is no legitimate reason for the decision. (See id.; Cieri Dep., Dkt. 63-6, at 15.)

From an equal protection standpoint, Plaintiffs have provided no substantiated facts to support an allegation that the cul-de-sac requirement was enforced only against their property. Cieri testified that, "I think that the Geisel tract had a cul-de-sac that was granted that was greater than 800 feet. I know we did a project for Richard Yingst on Blue Mountain Parkway that we were limited in our cul-de-sac length." (Cieri's Dep., Dkt. 63-6, at 13.) It thus appears that other cul-de-sac lengths were also limited. Moreover, Cieri's assertion that he thinks that a tract had a cul-de-sac length that was greater than 800 feet does not supply competent evidence that a similarly situated parcel was treated differently. Nor does the record provide any information to support a conclusion that Plaintiffs' circumstances were similar to Geisel's. Thus, Plaintiffs have failed to offer evidence that an equal protection violation occurred.

4. Ten (10) Lot Subdivision/ Public Road

Plaintiffs' contend that Defendants violated their substantive due process and equal protection rights by requiring a public road for a ten-lot subdivision. Plaintiffs' Amended Complaint avers:

36

> In the 1990s, Defendants, with their solicitor and engineer, prevented
> Plaintiffs from developing an 89-acre parcel with ten lots by claiming that
> parcels of remaining land, parcels reserved for septic systems, and even
> parcels owned by others were 'lots' and even though only ten lots were
> requested, the road had to be 'public' and/or conform with 'public' standard of
> width, length, and other Township standards which would make a ten-lot
> subdivision with <u>seven</u> saleable lots on 89 acres totally impractical.

(Amended Complaint, Dkt. 22, at ¶ 43.)  During his deposition, Mr. Angino elaborated on this contention, explaining that "the Township counted other properties and lots to which the proposed road provided access, and came up with . . . 13 or 16 lots; which meant that the road had to be built to public road standards rather than private road standards because it was more than ten lots."  (Angino Dep., Dkt. 63-4, at 16.)

Plaintiffs submitted a plan which was denied in a letter from Mr. Ernico in December of 1998.  (<u>Id.</u> at 17.)  The letter denied the plan for a number of reasons, including that it exceeded the ten percent grade, needed revision of sewer modules, there were setback issues, the curve radius was not proper, and the Geisel cul-de-sac needed to be eliminated and continued as a public road.  (<u>Id.</u>)  Plaintiffs do not agree that these contentions are factually accurate, and contend that all of "those things were minor.  All of them could have been corrected," but that the public road requirement was so cost-prohibitive that they could not complete the project.  (<u>Id.</u>)

Plaintiffs are not averring that the public road requirement for a sub-division with more than ten lots is unconstitutional, but instead, that the Board's determination that

37

Plaintiffs' plan included more than ten lots violated their substantive due process rights. (See Amended Complaint, Dkt. 22, at ¶43.) The determination that more than ten lots were included in the development was an executive action, and the heightened "shocks the conscience" standard will be employed.

The Board's determination that there were more than ten lots does not shock the conscience. The letter from the Board to Mr. Angino includes the analysis undertaken by the Board, indicating that, in addition to the ten enumerated lots, there were two residual pieces of property to the north and south that would be considered lots, that the two adjoining tracts that originated out of parcel "C-52-595" would be considered lots, and that the current parcel owned by Mr. James Roxbury would be considered a lot since he testified that he would use the roadway to access his home. (Dec. 16, 1998 Letter, Dkt. 67, at 17-18.) Furthermore, the letter indicates that at the November Board of Supervisors Meeting, Mr. Angino clearly stated that he "preferred to have it as a public street and were [sic] going to designate it as a public street." (Id. at 18.) It is clear, therefore, that the determination that there were more than ten lots in the subdivision, thus requiring a public road, did not shock the conscience. Moreover, there is no evidence of self dealing, corruption, bias against an ethnic group, or any additional activity that may suggest conscience-shocking behavior. Therefore, enforcement of the public road requirement affords no basis for relief in this action on a substantive due process theory. See Dotzel, 306 F. App'x at 801;

Chainey, 523 F.3d at 220.

Turning to Plaintiffs' equal protection argument, it is clear that Plaintiffs lack competent evidence that other similarly situated parcels were treated differently. When asked whether he would agree that "the Supervisors and Mr. Keffer of Light-Heigel testified that [the above stated standard] has been the consistent interpretation of all plans that have been submitted. And they have been enforced against all developers over the years," Mr. Angino responded that he could not "possibly know what they have done." (Angino Dep., Dkt. 63-4, at 16.) Moreover, Mr. Angino admitted that he did not have any evidence that this provision had not been enforced against all developers. (Id.) Consequently, Plaintiffs' equal protection claim fails.

### 5. Detention Basins (Hoover Dam)

Plaintiffs aver that they were "required to construct two additional smaller detention ponds and another larger detention pond ("Hoover Dam") although there was no need for same." (Amended Complaint, Dkt. 22, at ¶ 46.) "With respect to the fourth pond ("Hoover Dam"), the then-existing Board demanded an impervious core to the dam even though there would only be a few feet of water at very rare intervals and only for a few hours." (Id. at ¶ 47.)

Although neither Plaintiffs' Amended Complaint nor their Brief in Opposition adequately explain the basis of this claim, a Memorandum Opinion from the Court of

Common Pleas of Dauphin County, issued on March 20, 2000, provides some insight.

> The land development plan submitted by Rettew [Plaintiffs' engineer]
> provided for a stormwater system which would divert runoff to two detention
> basins; stormwater would first reach basin one, designed to store water for a
> short period, then slowly release down grade to basin two through an outlet
> pipe. Basin two, also designed to detain water for a short time, would slowly
> release the water by outlet pipe to a nearby stream. Basin two . . . was
> essentially a retention pond constructed in 1994 as part of the plaintiffs'
> unrelated development of their spa and fitness center. The pond was
> expanded in 1996 because of a few occasions of overflow.
>
>       Unbeknownst to plaintiffs, Rettew had incorporated basin two into the
> stormwater plan and had designed it to have an impermeable clay core.
> Furthermore, Retter's stormwater management plan was allegedly
> unnecessarily broad, designed to account not just for the stormwater from the
> eight acre lodge area, but also for all 165 acres of plaintiffs' surrounding
> property.

(Mar. 20, 2000 Court of Common Pleas Decision, Dkt. 23-11, at 4.)[19]

As Plaintiffs are contending that the Board's executive action deprived them of

substantive due process, the heightened "shocks the conscience" standard will be

---

[19] Furthermore, the Meeting Minutes of the May 3, 1999 Board of Supervisors
Meeting reveal that:

> Basin No. 2 was previously approved as designed with an impermeable clay
> core. The revised plan does not provide for any remediation of Basin No. 2
> as constructed without the designated clay core. The Township has agreed
> that it will not require the clay core if your engineer will certify that Basin No. 2
> as constructed can sustain a 100 year storm event without structural failure.
> This certification is essential due to Basin No. 2's proximity to a neighboring
> house located at the foot of the embankment and the fact that the
> embankment of Basin No. 2 does not have proper slope.

(May 3, 1999 Minutes, Dkt. 66-3, at 30.)

employed.  The requirement that Plaintiffs build the basins with an impermeable clay core, as the approved plans indicated, does not involve the abuse of executive action, egregious official conduct, or self-dealing on the part of the Defendants.  See County of Sacramento, 523 U.S. at 846; Dotzel, 306 F. App'x at 801.  Moreover, Plaintiffs have failed to provide any evidence of an equal protection violation; consequently, this claim shall be dismissed as well.

### 6.  Agricultural Zoning

Plaintiffs complain that zoning Plaintiffs' property as A-RR (Agricultural and Rural Residential) violated their constitutional rights.  Plaintiffs' Amended Complaint avers:

> The then-existing Board arbitrarily, capriciously, illegally, and in violation of the federal and state constitutions in their 1998 Comprehensive Plan and 2000 Zoning Ordinance road [sic] blocked Plaintiffs' plans for developing a resort community by designating 80% of the Township and all of Plaintiffs' land as 'Agricultural/Rural Residential' when the Comprehensive Plan recognized Middle Paxton Township as a 'bedroom' community and none of it filled the criteria of soils, slope, present use for agricultural districts.

(Amended Complaint, Dkt. 22, at ¶ 73.)  Plaintiffs assert:

> Forcing Plaintiffs to choose between R-1 with cluster and A/RR with resort as subsequently interpreted by Defendants clearly constitutes a breach of promise, mutual understanding, Plaintiffs' constitutional right to property and equal treatment under the law, and has resulted in Plaintiffs' being unable to develop their property in a typical resort manner.

(Brief in Opp., Dkt. 65, at 9.)

R-1 zoning permits one acre lots, cluster zoning and open space zoning.  (Angino

Dep., Dkt. 63-4, at 27.)  Mr. Angino complains:

> back then I was presented with an issue of zoning at the Comprehensive Plan
> where it seemed to make sense to be R-1, to be in a district that permitted
> higher density use.  When I later learned that resorts were only going to be
> permitted in ARR, I again ingenuously said, Well, I am a resort.  I should be
> ARR; because then I will be able to develop even more densely than you
> would in R-1 because resorts have hotels, they have lodges, they have all this
> kind of thing.

(Id. at 27.)

With regard to the equal protection claim, Plaintiffs aver that the 2000 Zoning

Ordinance designated as high density only three parcels of land, which were owned by two

individuals, John Vartan and Hyles Hagy.  (Amended Complaint, Dkt. 22, at ¶¶ 85-86.)  The

three parcels have not been developed as "high density," but instead have been developed

at "low density," a nonconforming use.  (Id. at ¶ 87.)  Plaintiffs aver:

> Defendants have treated Plaintiffs differently from Vartan and Hagy by
> permitting high density designation/low density development as to Vartan and
> Hagy even though up until recently with respect to the Vartan property no
> attempt has been made by either Vartan or Hagy to develop the properties in
> a high density manner, and yet Defendants specifically denied Plaintiffs the
> ability to develop their property as high density despite their desire and their
> developed resort status and existing high density development, existing
> sewer, existing roads, and public water and sewer infrastructure.

(Amended Complaint, Dkt. 22, at ¶ 89.)

When asked: "What is it about being an ARR that is an issue before the Federal

Court?" Angino responded:

> Okay. So to cut to the chase here, nothing.  Because the only difference

between ARR and R-1 comes under Category 2, which is residential development and it says detached homes, two acre. And the court has already determined that that is reasonable. So I cannot dispute that, except obviously my petition for certiorari if the U.S. Supreme Court decides something. But for now, we are assuming that this won't be accepted. It won't change it. And I don't want to wait until the U.S. Supreme Court decides that. So as it stands now, there is no difference between ARR and R-1 as the court has ruled to date. And we have bypassed that whole thing by focusing on Category No. 9, which is the resort, rather than Category No. 2, which was residential development. So the whole thing has become moot in that regard.

(Angino Dep., Dkt. 63-4, at 28) (emphasis added). As Mr. Angino has admitted that this issue is moot and has provided no pertinent argument in the Brief in Opposition, this claim will be dismissed.

### 7. Sign Discrimination

Plaintiffs claim that they were unconstitutionally required to remove a sign advertising Felicita Resorts. The Amended Complaint states: "Defendants have instituted proceedings and forced Plaintiffs to take down signs designating the location of Plaintiffs' Resort while permitting similar signs for the Sheaffer Memorial Park." (Amended Complaint, Dkt. 22, at ¶ 94.) In his deposition, Mr. Angino asserted that the Township discriminated against his sign by making him remove it, stating:

Sheaffer was a neighbor of mine; and she and I had a lot of land disputes because of her being a neighbor. . . . . So she donated land across the street to this church that she belonged to. . . . But they decided to put up three very large, very expensive signs; one of them would have been to the east of their property and one was to the west of their property. And the third was right off of the interstate, limited access, 443. So that every time I would go home

43

from 322/22, I see this beautiful big sign.  And this is within the last ten years.
. . . . People coming to our resort, even though we have signs at the property,
it might help them to know that we're half a mile up or whatever.  This is land I
own, so it is part of the resort.  It is not different here than it is there.  So I put
up a much less expensive sign, probably a much smaller sign.  And there I
get my letter about my sign that it is not in keeping with the Middle Paxton
Township Zoning Ordinance.

(Angino Dep., Dkt. 63-4, at 29-30.)

Other than Mr. Angino's statement that the church sign violates the ordinance,

Plaintiffs have provided no evidence to support a finding that they were improperly treated

differently.  The minutes of a March 1, 2004 Board of Supervisors Meeting revealed that Mr.

Angino had erected a sign advertising Felicita Resort that did not comply with zoning

regulations in the A-RR district and a notice of violation was sent, which could be appealed

to the Zoning Hearing Board.  (Mar. 1, 2004 Minutes, Dkt. 66-3, at 74.)  The April 5, 2004

Meeting Minutes also indicate that a sign hearing was scheduled between the Anginos and

the Zoning Hearing Board on April 14, 2004.  (Apr. 5, 2004 Minutes, Dkt. 66-3, at 36.)

When asked at his deposition whether Julie Seeds measured Plaintiffs' sign and

found that it was a freestanding sign in a business district that was the wrong size and too

close to the right-of-way, Angino responded, "guilty on all counts."  (Angino Dep., Dkt. 63-4,

at 32.)  Thus, based on this evidence, it appears that the Township had a valid basis for

ordering the removal of Plaintiffs' sign.

Plaintiffs have failed to provide any competent evidence to support an assertion that

they were discriminated against or that their due process rights were violated.  As Plaintiffs are claiming that Defendants' executive actions violated their constitutional rights, the heightened "shocks the conscience" standard will be employed.  The actions taken by Defendants do not "shock the conscience," as Mr. Angino has admitted that the sign was the wrong size and too close to the right-of-way.  Moreover, there is no evidence of discrimination.  Plaintiffs have failed to provide any evidence that other similarly situated people were treated differently.  Although they allege that Sheaffer Memorial Park was permitted to have a non-conforming sign, they have provided no evidence of this fact.[20] Thus, the due process and equal protection claims pertaining to signage will be dismissed.

        8.  Pole Barn

Plaintiffs contend that the denial of their proposal to build a pole barn violated their due process and equal protection rights.  This claim involves the building of a pole barn for storage.  (Angino Dep., Dkt. 63-4, at 34.)  Plaintiffs had to file a development plan because the barn would be on commercially used property, and Plaintiffs were told that they could not store files from Mr. Angino's law firm in the building because it was in an A-RR district.  (Id.)  At his deposition, Mr. Angino admitted that he has no evidence to support whether the Township has "been checking anybody else's barns to find out what they put in their barns."

_____

[20] There additionally appears to be evidence that the Sheaffer Memorial Pak had a permit for the sign under a previous ordinance. (See Angino Dep., Dkt. 63-4, at 32.)

(Id.)  Mr. Angino contends it is a violation of due process because, although all applicants for commercial buildings have to file a site development plan, that requirement is unreasonable as applied to him.  Plaintiffs aver that their "request for a permit to construct a 'pole' barn to store farm equipment and closed files for Angino & Rovner's law office was met with a demand for a development plan and a question as to the propriety of storing legal files in an A/RR district."  (Amended Complaint, Dkt. 22, at ¶ 96.)

> The April 4, 2005 Board of Supervisors Meeting Minutes state:
>
> A proposed building on the Felicita resort grounds was discussed.  A 50' x 50' section will be used for storage of files.  A 50' x 90' section will be used for equipment storage for Felicita.  A site plan will need to be filed and approved. Mr. Macamer interjected that E & S approval from County Conservation will be required since the building is greater than 5,000 square feet.  Mr. Angino will be made aware that the building, due to Zoning Constraints, can be utilized for storage of Felicita resort files only.

(April 4, 2005 Minutes, Dkt. 66-3, at 70.)  Additionally, there appears to be evidence that Julie Seeds testified that the permit requirement was "to enable people to understand better what the commercial use was going to be that people wanted."  (Angino Dep., Dkt. 63-4, at 35.)  Moreover, Mr. Angino admitted that Ms. Seeds made a statement to him along these lines. (Id.)

As Plaintiffs' claim is that the requirement of a permit for commercial buildings violates substantive due process rights, Plaintiffs' claim is legislative and the "rationally related" standard will be employed.  See County Concrete, 442 F.3d at 169.  "'Federal

46

judicial interference with a state zoning board's quasi-legislation for 'irrationality' or 'arbitrariness' is proper only if the governmental body could have had no legitimate reason for its decision.'" Id. (quoting Phillips, 107 F.3d at 186).  Here, there are facts in the record establishing a legitimate reason for the requirement.  Mr. Angino admitted that there is testimony that revealed that the requirement is to enable people to better understand the proposed commercial use of the building.  (See Angino Dep., Dkt. 63-4, at 35.)  Moreover, Plaintiffs have not provided any evidence that the requirement was only enforced against them or that other commercial properties were allowed to construct structures without the requisite plan.  Thus, Plaintiffs' claims for violation of both due process and equal protection based on the requirement of a site development plan for the construction of a pole barn is without merit.

9.  Unreasonable Delay Regarding Conference Center Permit

Plaintiffs contend that Defendants violated their due process rights by unreasonably delaying the granting of a permit to build a conference center.[21]  Plaintiffs allege:

> Although more than two years ago Plaintiffs proposed to develop a 3500 square feet conference center, Defendants' arbitrary and capricious actions have resulted in more than a two year delay during which time the cost of building materials and the rise in interest rates have made the construction of a conference center impossible.

---

[21] Mr. Angino, in his deposition, admitted that there was no equal protection argument with regard to his conference center delay claim.  (Angino Dep., Dkt. 63-4, at 38.)

47

(Amended Complaint, Dkt. 22, at ¶ 97.)  Defendants' attorney, in trying to define this issue, asked if the basis of the argument was "because they said this was going to be an additional use, you had to justify the parking by a traffic count, and your engineer planner had to justify that the septic system was adequate for the hypothetical number of people." (Angino Dep., Dkt. 63-4, at 38.) Mr. Angino responded as follows: "I cannot have said it better." (Id.)  Angino testified that "our guy had to keep asking for continuances because he had to prove to them how many cars were going to turn into there to see if you needed more parking. . . . . So yes, he kept asking for continuances to try to answer their stupid, asinine, idiotic questions."  (Id.)  Plaintiffs' claim is that "[i]t is idiotic, arbitrary, capricious, [and] unreasonable" to force Plaintiffs to compute the increase in traffic and septic use that would be caused by building a conference center.  (Id.)

Significantly, the conference center plans were eventually approved.  Plaintiffs contend that the delay effectively killed the project because of construction cost inflation. (Id. at 39.)  The conference center saga is chronicled in the Board of Supervisors Meeting Minutes.  At the April 5, 2004 Meeting:

> Mr. Hipp . . . reported that no response had been received from Mr. Angino concerning the Solicitor's February 27, 2004 letter.  The letter was a response to Mr. Angino's question regarding what was necessary to construct meeting rooms at the Felecita [sic] facilities.  It is the Solicitor's opinion that a land development plan must be filed and approved.

(Apr. 5, 2004 Minutes, Dkt. 66-3, at 35.)  At the October 4, 2004 Board of Supervisors

Meeting:

The Board discussed the Felicita Conference Center plan. Although action has not been taken on the plan by the Planning Commission, the time extension is set to expire during October. Therefore the Board took action to reject the plan unless an additional time extension is granted. The reasons for rejection are contained in the Township engineer review dated 9/24/04 and the Township Sewer Enforcement Officer letter dated 9/30/04.

(Oct. 4, 2004 Minutes, Dkt. 66-3, at 39.) The March 7, 2005 Meeting Minutes state:

The Felicita Conference Center was reviewed. The plan was [presented] by Melissa Batola of Act One Engineering. Mrs. Davis questioned potential parking problems. Concern was raised about the distance from some proposed parking areas to the Conference center as well as the number of parking spaces available. Since no typical parking space size is shown on the plan it is important to determine if sufficient spaces are available. It was also determined that page CC-1 was missing from the plans supplied to the Board members. The status of the State Highway Occupancy permit should be verified in light of the plan. The plan was tabled. Additional information regarding the above items and the missing page will be supplied. A time extension for plan action had previously been granted until April 6, 2005.

(March 7, 2005 Minutes, Dkt. 66-3, at 42-43.) The April 4, 2005 Meeting Minutes reveal:

The Board accepted a time extension for plan action until June 9, 2005 for the Felicita Conference Center Plan. The Township Engineer was not furnished a copy of the revised plan for review until the time of the meeting by the developer.

(April 4, 2005 Minutes, Dkt. 66-3, at 69.) Meeting Minutes from a June 6, 2005 Board of

Supervisors meeting indicates that the conference center plan was rejected for the following

reasons:

1.) Plans lacked the signature and seal of the Engineer and Surveyor (SALDO 307 E.)

49

2.) Plans lacked the notarized signature of the owners in the Certificate of Ownership and Acknowledgment of the plan (SALDO 307 D)

. . . .

4.) No plan book reference for Mockingbird Drive Extended (SALDO 307 A)

5.) No evidence of approval or evan [sic] submission of the Required Erosion Sedimentation Control Plan to the Dauphin County Conservation District. (SWM 430 C2)

6.) No evidence of an executed Stormwater Facility Maintenance Agreement or required performance guarantee (SWM 430 C & 702 A)

7.) No evidence of approval or even submission of the required Sewage Facilities Planning module to the Township SEO or State DEP (SALDO 308, ZO 1312).

This action was taken after discussion and an indication from Mr. Angino's representatives at the meeting that the E & S plan as well as the Sewage Module had not been submitted or approved. The representative further indicated that approval was not likely in a reasonable timeframe since other outstanding issues with DEP had to be resolved first.

(June 6, 2005 Minutes, Dkt. 66-3, at 46-47.)[22] The November 7, 2005 Meeting Minutes of

---

[22] After the rejection of the plan, the Anginos filed a request for reconsideration, which was addressed in the August 1, 2005 Meeting Minutes as follows:

The Felicita Conference Center plan was discussed. Mr. Angino, Mr. Cieri and Ms. Smith, attorney were present. Ms. Smith indicated that the NPDES permit would be issued within the next two weeks. However no written substantiation of the assertion was presented. During a long discussion Mrs. Wilhelm expressed parking and noise concerns regarding the project. Mr. Angino had requested a reconsideration of the June rejection of the plan. The Board reviewed the reconsideration request at the July 5, 2005 meeting. The Board at that time, stated that if all requested information was supplied by the August 1, 2005 meeting the plan would be reconsidered. Since all requested information, including a completed sewage module and E & S plan have not been provided the Board decided to deny the request for reconsideration.

(August 1, 2005 Minutes, Dkt. 66-3, at 49.)

the Board of Supervisors states:

> The Felicita Conference Center plan was again discussed, a completed
> sewage module is still not filed. The information the SEO requested many
> months ago concerning peak flows still has not been provided. Mr. Cieri, the
> developer's representative, indicated that it would be provided in about 2
> weeks. Additionally an improvement agreement and a $5,000.00 letter of
> credit will be required. The plan was tabled until the December meeting.

(Nov. 7, 2005 Minutes, Dkt. 66-3, at 58.) The December 5, 2005 Meeting Minutes of the

Board of Supervisors reveals:

> The Felicita Conference Center plan was reviewed. It was decided to return a
> check in the amount of $1,100.00 since the fee was not required due to the
> fact that the plan was received under the previous Stormwater Ordinance.
> The plan itself was approved contingent upon the following:
> 1.) DEP approval of the Sewage Module.
> 2.) Completion of a Stormwater agreement and posting of a $5,000.00 letter
> of credit.

(Dec. 5, 2005 Minutes, Dkt. 66-3, at 61.)[23]

As Plaintiffs' claim is that the executive action taken by the Board in delaying

---

[23] At the May 1, 2006, Board of Supervisors meeting, the Conference Center plan
was re-approved contingent upon:

> 1. Submission of signed, notarized and sealed plans.
> 2. Completion of a Stormwater Maintenance Agreement.
> 3. Posting of a $5,000 letter of credit.
> 4. Note added to the plan indicating that there will be no footings in the
> floodplain. The portion of the building in the floodplain will be elevated or
> cantilevered.

(May 1, 2006 Minutes, Dkt. 66-3, at 65.)

approval of the conference center was unreasonable, the heightened "shocks the conscience" standard will be employed. This behavior is far from conscience-shocking. See Lindquist v. Buckingham Twp., 106 F. App'x 768, at 774 (3d Cir. July 19, 2004) (citing Baker v. Coxe, 230 F.3d 470, 474 (1st Cir. 2000) ("[E]ven an arbitrary denial of [a building] permit in violation of state law - even in bad faith - does not rise above the constitutional threshold for equal protection and substantive due process claims.")). Furthermore, it is clear that the initial plan did not fulfill the permit requirements, see June 6, 2005 Minutes, Dkt. 66-3, at 46-47, that Plaintiffs requested extensions, see April 4, 2005 Minutes, Dkt. 66-3, at 69, and that Plaintiffs delayed in providing requested information, see April 4, 2005 Minutes, Dkt. 66-3, at 69, each, presumably, causing further delay in the granting of the permit. Consequently, Plaintiffs' claim of denial of constitutional rights based on unreasonable delay in granting approval of the conference center is without merit.

          10. Additional Issues

      Plaintiffs also assert that there are two additional issues, not specifically presented in their Amended Complaint, that need to be resolved: 1) the naming of driveways; and 2) Vartan, Heary, McNaughton Development variances. (Dkt. 63-3, at 31-33.) Neither Plaintiffs' Amended Complaint nor their Brief in Opposition provide any argument as to the bases of these claims, nor any facts to support such claims. This Court will not review allegations that have not been properly presented in a pleading or briefed.

E. Conspiracy

Count II of Plaintiffs' Complaint alleges that Defendants "did act and continue to act and conspire among themselves, their solicitor, engineers, and others with a common purpose to deprive Plaintiffs of their federally protected rights under the Constitution of the United States and the laws of the United States." (Amended Complaint, Dkt. 22, ¶ 106.) "'Provided that there is an underlying constitutional deprivation, the conspiracy claim allows for imputed liability; a plaintiff may be able to impose liability on one defendant for the actions of another performed in the course of the conspiracy.'" Hold Cargo Sys., Inc., 20 F. Supp. 2d at 843 (quoting Dixon v. City of Lawton, Okl., 898 F.2d 1443, 1449 (10th Cir. 1990)). Because Plaintiffs have failed to present evidence to support any constitutional claim, Defendants are entitled to summary judgment on the civil conspiracy claim.

III. CONCLUSION

Plaintiffs have had an acrimonious, hostile, and litigious relationship with Middle Paxton Township. Plaintiffs bitterly complain of being required to comply with land use rules and regulations with which they disagree. They succeeded in showing that the initial steep slope provisions of the Zoning Ordinance were invalid, i.e., arbitrary and irrational, but are unable to show that any specific development plans were rejected on the basis of the invalid steep slope provisions. Accordingly, they cannot present a viable damage claim in connection with the invalidated steep slope provisions. Defendants' enforcement of valid

land use regulations neither shocks the conscience nor abridges equal protection principles. The challenge to the application of the definition of "resorts" to Plaintiffs' situation is precluded by the state court adjudication, and Plaintiffs have not shown that other parts of the Zoning Ordinance are arbitrary or irrational.  Accordingly, Defendants will be granted summary judgment.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RICHARD C. ANGINO, ALICE K. ANGINO, :
KING DRIVE CORP. :
                Plaintiffs :
    v. : 1:CV-05-1748
                                       : (JUDGE VANASKIE)
J. THOMAS VAN WAGNER, Individually :
and as a Supervisor of Middle Paxton :
Township, et al. :
                Defendants :

## ORDER

NOW, THIS 3rd DAY OF SEPTEMBER, 2009, for the reasons set forth in the

foregoing memorandum, IT IS HEREBY ORDERED THAT:

1. Defendants' Motion for Summary Judgment (Dkt. 62) is GRANTED.

2. The Clerk of Court shall mark this matter CLOSED.

                                    s/ Thomas I. Vanaskie
                                    Thomas I. Vanaskie
                                    United States District Judge